UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE *EX PARTE* APPLICATION
OF OVIK MKRTCHYAN,

               Petitioner.

Case No.: _2:25-mc-00060-TL

**DECLARATION OF NIGEL TAIT IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

Pursuant to 28 U.S.C. § 1746, I, Nigel Tait, declare as follows:

1.  I am the Managing Partner of Carter-Ruck LLP and a solicitor in the Senior Courts of England and Wales. My firm represents Petitioner Ovik Mkrtchyan in England and Wales. We currently represent Mr. Mkrtchyan in two separate matters proceeding in the King's Bench Division of the High Court of England and Wales, namely: (1) libel proceedings against 2Trom Media Group and Viktor Tokarev; and (2) libel proceedings against Radha Stirling (the "Claims"). The Claims were both issued (initiated) on 22 April 2025, and Mr. Mkrtchyan is the Claimant in both matters. The High Court is a tribunal of first instance that hears evidence, including evidence from abroad, and adjudicates claims.

2.  I submit this declaration in support of Mr. Mkrtchyan's Application for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 (the "Application"). I make this declaration based on my personal knowledge except where otherwise indicated.

3.      As explained below, the Application seeks discovery under Section 1782 for use in the Claims, as well as contemplated proceedings involving an alleged conspiracy to injure Mr. Mkrtchyan.

4.      Both his existing and contemplated claims are expected to be based in part on any supporting evidence of a broader coordinated disinformation campaign and tortious conspiracy that is gathered as part of the Application.

**I.      Qualifications**

5.      I am the Managing Partner and Head of Media Law at Carter-Ruck.  I have been licensed to practice law in England and Wales since 1988.

6.      I joined Carter-Ruck (then-called Peter Carter-Ruck and Partners) in 1986 as a trainee.  I qualified at the firm in 1988 and have been the Managing Partner and Head of Media Law at the firm for over ten years, specializing in reputation, media, privacy and commercial litigation.

7.      My practice primarily encompasses media disputes involving libel, misuse of private information and data protection.  Carter-Ruck acts for both claimants and defendants in these matters.  I have also acted for clients in commercial litigation, including breach of contract and professional negligence.

**II.      Pending and Contemplated Proceedings in England**

8.      On 22 April 2025, this firm filed the Claim forms on behalf of Mr. Mkrtchyan in the Claims.

9.      The first Claim (the "London Post Proceedings") relates to the publication of an article on the website "The London Post" entitled "Corruption Networks of Uzbekistan: From Washington to Tashkent" on 19 October 2024.  The Article remains accessible at the following

URL: https://london-post.co.uk/corruption-networks-of-uzbekistan-from-washington-to-tashkent. The London Post is an online content hosting platform. The defendants in the London Post Proceedings are 2Trom Media Group and Viktor Tokarev of Moscow Media Group. On information and belief, 2Trom Media Group owns and publishes The London Post, and Tokarev is its sole director. The claim seeks damages, including aggravated damages and exemplary damages, injunctive relief, and other statutory remedies for libel arising from the publication of the London Post Article.

10.    The second Claim (the "Stirling Proceedings") relates to the publication of an article by Stirling on her website "Radha Stirling", and on a series of other websites and social media platforms owned and/or operated by her, entitled "US Lobbyists used in plot to destabilise US relations with Uzbekistan and steal Central Asia's largest cement holding" on 18 January 2025. The Article was first published at the following URL: https://www.radhastirling.com/single-post/uslobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-stealcentral-asia-s-large and was republished across several platforms owned and operated by Stirling. The defendant in the Stirling Proceedings is Stirling, a public relations consultant who, on information and belief, is based outside the U.S. The claim seeks damages, including aggravated damages, injunctive relief, and other statutory remedies for libel arising from the publication of the aforementioned content.

11.    A true and correct copy of the claim form initiating the Claim in the London Post Proceedings is attached as **Exhibit 1**.

12.    A true and correct copy of the claim form initiating the Claim in the Stirling Proceedings is attached as **Exhibit 2**.

13.     Particulars of Claim were served in the Stirling Proceedings on 6 June 2025 and a true and correct copy is attached as **Exhibit 3**.  Particulars of Claim were served in the London Post Proceedings on 12 June 2025, and a true and correct copy is attached as **Exhibit 4**.

14.     Without waiving privilege, my firm is also currently instructed by Mr. Mkrtchyan in connection with contemplated additional civil proceedings in England and Wales including, without limitation, tortious conspiracy and further libel claims in respect of additional defendants who caused the publications in the London Post Proceedings and the Stirling Proceedings to be published, and/or caused, participated in or authorized the publication of any other publications forming part of the campaign.  It is contemplated that such proceedings would also proceed in England and Wales.

### III.     The Discovery Sought by the Application

15.     In my capacity as solicitor for Mr. Mkrtchyan in connection with the pending and contemplated proceedings in England and Wales, I consider that the discovery sought from Respondents is relevant to these proceedings, as explained in more detail below.

16.     Mr. Mkrtchyan asserts, and we intend to ask the English courts to conclude, that following his wrongful detention in early 2024 and since at least mid-2024, Mr. Mkrtchyan has been the target of a coordinated disinformation campaign carried out against him and his family members and business associates, escalating from August 2024 onwards (the "Campaign").

17.     As part of this, Mr. Mkrtchyan asserts that individuals and entities with a connection to the Campaign include: 2Trom Media Group and Viktor Tokarev, owners of The London Post (defendants in the London Post Proceedings); Stirling (defendant in the Stirling Proceedings); Ulugbek Shadmanov (an apparent client of Stirling), Shadmanov's company United Cement Group ("UCG"); Stephen Akard (legal and non-legal advisor to Shadmanov and UCG);

Stephen Payne (an individual in Texas, acting himself and through his affiliated companies and their employees); and their other agents and persons with a vested interest in causing reputational damage to Mr. Mkrtchyan.

18.    Mr. Mkrtchyan seeks to redress the harm caused by the Campaign in both pending and contemplated proceedings in England and Wales.  He has filed civil libel claims against two participants—the owners of The London Post and Stirling—and we anticipate pursuing additional claims, including claims for libel and in the tort of conspiracy, against defendants subject to jurisdiction in England, and/or including additional defendants in the pending proceedings.  In both of the pending proceedings in England and Wales, Mr. Mkrtchyan argues in support of his claim for aggravated damages that the respective defendants did not publish the offending statements as part of an exercise in legitimate and responsible journalism (and/or, in Stirling's case, an exercise in disinterested policy activism).  His case is that the defendants in the Claims were aided, funded and/or encouraged to publish by others involved in the Campaign, including individuals whom he cannot presently identify.  It is also believed that these individuals caused the publication of other defamatory third-party publications relating to Mr. Mkrtchyan.

19.    In English law, letters to governments and/or government officials may found a claim in defamation or conspiracy, subject to the availability of any defences.  A defence of qualified privilege may subsist in respect of a claim in defamation, but not a claim in conspiracy.  A qualified privilege defence to a defamation complaint over a given publication (on the basis of it making a report to the appropriate authorities or otherwise) would, if Mr. Mkrtchyan's case as to the existence of the Campaign were accepted, be likely to be defeated by proof of malice.

20.    Mr. Mkrtchyan's existing and contemplated claims will be based in part on any supporting evidence that is gathered as part of this Application which demonstrates a broader

coordinated disinformation campaign and conspiracy to injure. Based on my review of the discovery requests that Mr. Mkrtchyan intends to make if his Application is granted, the discovery that he seeks is for use in his pending and contemplated claims.

21.    T-Mobile USA, Inc. ("T-Mobile") is not a party to the English proceedings.

22.    Mr. Mkrtchyan has no known way to obtain this information from T-Mobile for use in the English and Welsh courts other than through the 1782 assistance of the U.S. court.

23.    Nor could Mr. Mkrtchyan compel the production of the requested information through the disclosure (discovery) available in the English proceedings, given that T-Mobile is not a party to these proceedings and the requested information goes beyond any material which might likely be the subject of disclosure obligations on the part of the defendants in the London Post Proceedings and the Stirling Proceedings.

**IV.    English Courts Accept Evidence Obtained Through Section 1782 Proceedings in U.S. Courts**

24.    Courts in England are generally receptive to information obtained through Section 1782 requests. The (then) highest Court in England and Wales, the House of Lords, in ***South Carolina Insurance Co. v. Assurantie Maatschappij De Zevem Provinvci en NV*** [1987] AC 24, a case concerned with an attempt to obtain an injunction to prevent the use of the procedure to provide pre-trial discovery, referred to the fact that any party preparing their case in the High Court is entitled to exercise such a right under U.S. law. A modern example is ***Nigeria v Process and Industrial Developments Ltd*** [2020] EWHC 2379 (Comm), where the Court granted an extension of time to the Federal Republic of Nigeria to challenge an arbitration award on grounds of fraud, referring in the course of its decision to the fact that evidence obtained through a Section 1782 Request made in the U.S. District Court for the Southern District of New York gave rise to a *prima facie* case in this regard. Accepting such assistance is consistent with English law regarding libel

and conspiracy, which seeks to provide an avenue for redress for injured claimants.  I am unaware of any directive given by the courts of England and Wales indicating that they would not be receptive to the judicial assistance requested in the Application.

25.    The Application is also consistent with English and Welsh law and public policy. For example, it does not seek any information protected by a privilege, such as legal advice privilege, or any information which is irrelevant to the issued and contemplated proceedings.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on 5 September 2025.


_____

Nigel Tait

# Exhibit 1



# Claim Form

| | |
|---|---|
| | In the High Court of Justice, King's Bench Division, Media and Communications List |
| Fee Account no. | PBA0088016 |
| Help with Fees – Ref no. (if applicable) | H W F – ☐☐☐☐ – ☐☐☐ |

**You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.**

| For court use only | |
|---|---|
| Claim no. | |
| Issue date | |

## Claimant(s) name(s) and address(es) including postcode

Mr Ovik Mkrtchyan

Aleksandra Čaka iela 96-2, Rīga, Latvia



SEAL

## Defendant(s) name and address(es) including postcode

(1)  2TROM MEDIA GROUP LTD; 207 Spinning Wheel Mead, Harlow, England, CM18 7AQ

(2)  Mr Viktor Tokarev; 207 Spinning Wheel Mead, Harlow, England, CM18 7AQ

## Brief details of claim

(1)  Damages, including aggravated damages, for libel arising from the publication of an article by the Defendants and each of them on the website "The London Post", entitled "Corruption Networks of Uzbekistan: From Washington to Tashkent" on 19 October 2024. The Article remains accessible at the following URL: https://london-post.co.uk/corruption-networks-of-uzbekistan-from-washington-to-tashkent.

(2)  An injunction to restrain the Defendants, whether by themselves, their servants, agents, or otherwise howsoever from publishing and/or causing to be published the same or similar words defamatory of the Claimant.

(3)  An order that the Defendants publish a summary of the Court's judgment, pursuant to s.12 of the Defamation Act 2013.

(4)  An order under s.13 of the Defamation Act 2013, if so required.

(5)  Costs

(6)  Such further or other relief as the court deems appropriate.

## Value

The Claimant cannot say how much he expects to recover but limits the value of his claim to £100,000.

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

This claim must be issued in the Media and Communications List of the High Court as it is a claim for libel (pursuant to section 15(2)(c) of the County Courts Act 1984, paragraph 2.9(1) of CPR Practice Direction 7A, and CPR 53.1(3)).

| Defendant's name and address for service including postcode | (1) 2TROM MEDIA GROUP LTD and (2) Viktor Tokarev; 207 Spinning Wheel Mead Harlow England CM18 7AQ | | £ |
|---|---|---|---|
| | | Amount claimed | £100,000 |
| | | Court fee | £5,646 |
| | | Legal representative's costs | TBC |
| | | **Total amount** | TBC |

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

  © Crown Copyright 2021

| Claim No. | |
|---|---|

Do you believe you, or a witness who will give evidence on your behalf, are vulnerable in any way which the court needs to consider?

☐ Yes. Please explain in what way you or the witness are vulnerable and what steps, support or adjustments you wish the court and the judge to consider.

[X] No

Does, or will, your claim include any issues under the Human Rights Act 1998? ☐ Yes [X] No

Particulars of Claim (~~attached~~) (to follow)

# Statement of Truth

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☐ **I believe** that the facts stated in this claim form and any attachment sheets are true.

☒ **The Claimant** believes that the facts stated in this claim form and any attachment sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant
☐ **Litigation friend** (where judgment creditor is a child or a patient)
☒ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 22  | 04    | 2025 |

Full name

Nigel Tait

Name of claimant's legal representative's firm

Carter-Ruck

If signing on behalf of firm or company give position or office held

Partner

Claimant's or claimant's legal representative's address to which documents should be sent.

Building and street

The Bureau, 90 Fetter Lane

Second line of address

Town or city

London

County (optional)

Postcode

E C 4 A 1 E N

If applicable

Phone number

02073535005

Fax phone number

DX number

Your Ref.

17956.3

Email

nigel.tait@carter-ruck.com; caitlin.harris@carter-ruck.com

# Exhibit 2



# Claim Form

| In the High Court of Justice, King's Bench Division, Media and Communications List |
|---|
| **Fee Account no.**   PBA0088016 |
| **Help with Fees –**
**Ref no.** (if applicable)   H W F – ⬚⬚⬚ – ⬚⬚⬚ |

| For court use only |
|---|
| Claim no. |
| Issue date |

**You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.**

## Claimant(s) name(s) and address(es) including postcode

Mr Ovik Mkrtchyan
Aleksandra Čaka iela 96-2, Rīga, Latvia


SEAL

## Defendant(s) name and address(es) including postcode

Ms Radha Stirling
128 City Road, London, EC1V 2NX, United Kingdom

## Brief details of claim

(1) Damages, including aggravated damages, for libel arising from the publication of an article by the Defendant on her website "Ipex Reform", entitled "US Lobbyists used in plot to destabilise US relations with Uzbekistan and steal Central Asia's largest cement holding" on 18 January 2025. The Article remains accessible at the following URL: https://www.ipexreform.com/post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large.

(2) An injunction to restrain the Defendant, whether by herself, her servants, agents, or otherwise howsoever from publishing and/or causing to be published the same or similar words defamatory of the Claimant.

(3) An order that the Defendant publish a summary of the Court's judgment, pursuant to s.12 of the Defamation Act 2013.

(4) An order under s.13 of the Defamation Act 2013, if so required.

(5) Costs

(6) Such further or other relief as the court deems appropriate.

## Value

The Claimant cannot say how much he expects to recover but limits the value of his claim to £100,000.

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

This claim must be issued in the Media and Communications List of the High Court as it is a claim for libel (pursuant to section 15(2)(c) of the County Courts Act 1984, paragraph 2.9(1) of CPR Practice Direction 7A, and CPR 53.1(3)).

| Defendant's name and address for service including postcode | Ms Radha Stirling
128 City Road
London
EC1V 2NX
United Kingdom | | £ |
|---|---|---|---|
| | | Amount claimed | £100,000 |
| | | Court fee | £5,646 |
| | | Legal representative's costs | TBC |
| | | **Total amount** | TBC |

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

   © Crown Copyright 2021

| Claim No. | |
|---|---|

Do you believe you, or a witness who will give evidence on your behalf, are vulnerable in any way which the court needs to consider?

[ ]　Yes.　Please explain in what way you or the witness are vulnerable and what steps, support or adjustments you wish the court and the judge to consider.

[X]　No

Does, or will, your claim include any issues under the Human Rights Act 1998? [ ] Yes [X] No

Particulars of Claim (~~attached~~) (to follow)

# Statement of Truth

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☐ **I believe** that the facts stated in this claim form and any attachment sheets are true.

☒ **The Claimant** believes that the facts stated in this claim form and any attachment sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant

☐ Litigation friend (where judgment creditor is a child or a patient)

☒ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 22 | 04 | 2025 |

Full name

Nigel Tait

Name of claimant's legal representative's firm

Carter-Ruck

If signing on behalf of firm or company give position or office held

Partner

Claimant's or claimant's legal representative's address to which documents should be sent.

Building and street

The Bureau, 90 Fetter Lane

Second line of address

Town or city

London

County (optional)

Postcode

E  C  4  A  1  E  N

If applicable

Phone number

02073535005

Fax phone number

DX number

Your Ref.

17956.2

Email

nigel.tait@carter-ruck.com; caitlin.harris@carter-ruck.com

# Exhibit 3

**IN THE HIGH COURT OF JUSTICE**       <u>**Claim no. KB-2025-001385**</u>
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

**B E T W E E N :**

**OVIK MKRTCHYAN**

<u>**Claimant**</u>

**- and -**

**RADHA STIRLING**

<u>**Defendant**</u>

---

**PARTICULARS OF CLAIM**

---

<u>**Parties**</u>

1. The Claimant is a businessman and entrepreneur. He is the sole shareholder of **Gor Investment Ltd** (Company number 03820831) ("**GIL**"), the parent company of a diverse portfolio of companies based in the UK, Uzbekistan and Canada. He is also a shareholder of five other UK-based companies, including the UK-registered company Gor Logistic Limited (Company number 04547356) ("**GLL**"), of which the Claimant is the sole shareholder. He resides in Latvia and holds Armenian and Cypriot citizenship.

2. The Defendant:

   2.1. is the owner and operator of www.radhastirling.com, www.dueprocess.international, www.detained-in-dubai.prowly.com and www.ipexreform.com ("**the Defendant's Websites**");

   2.2. is the sole Director and shareholder of Stirling and Partners Limited (Company number 12379168), Detained In Dubai Limited (Company number 12145991), and Radha Stirling Limited (Company number 11247852); and

1

2.3. operates at least 11 different websites including those listed at paragraph 2.1 above, and associated accounts on YouTube and the social media platforms Facebook, X (Twitter), and LinkedIn. The Defendant's commercial activities include offering legal, public affairs, and communications services, and she holds herself out as offering *"strategic"*, *"consulting"* and *"campaign management"* services.

**<u>The words complained of</u>**

3. On or about 16 January 2025, the Defendant published an article on her website, radhastirling.com, entitled "*US Lobbyists used in plot to destabilise US relations with Uzbekistan and steal Central Asia's largest cement holding*" ("**the Article**"). It was published at the following URL: https://www.radhastirling.com/single-post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large ("**Publication 1a**").

4. The Defendant further published and/or re-published the Article on other Websites operated by her and/or for which she is responsible as a matter of law, in materially identical terms, as follows:

   4.1. On or about 16 January 2025, the Defendant published the Article on the website detained-in-dubai.prowly.com. It was accessible at the following URL (but has since been taken down): https://detained-in-dubai.prowly.com/376068-us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asias-largest-cement-holding ("**Publication 2**").

   4.2. On or about 17 January 2025, the Defendant published the Article on the website dueprocess.international. It remains accessible at the following URL: https://www.dueprocess.international/post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large ("**Publication 3"**).

4.3. On or about 18 January 2025, the Defendant published the Article on the website ipexreform.com. It was accessible at the following URL (but has since been taken down): https://www.ipexreform.com/post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large ("**Publication 4"**).

5. The Article contained the following underlined words defamatory of and concerning the Claimant ("**the Words Complained Of**"):

"Aripov's key business partner is Russian citizen and Oligarch, **Ovik Mkrtchyan**, the head of GOR Investments for which former US Energy Secretary, Rick Perry and Mike Pompeo are members of the advisory board. Mkrtchyan was detained in Uzbekistan in January 2024 on corruption related charges, **reportedly having transferred more than a billion dollars** to offshore accounts.

Payne is a registered lobbyist for Aripov whose allies, Pompeo and Perry, sit on the board of his client's business partner's (Oligarch Ovik Mkrtchyan) company who was arrested over corruption allegations. He has been accused of embezzling the company's wealth after appropriating Asia Alliance Bank from Gulnara Karimova, the former President's daughter, and establishing dozens of offshore companies.
…

Corruption in Uzbekistan
Influential but corrupt people within Uzbekistan, who are close to the political opposition, with links to Russian organised crime and a history of appropriating businesses are targeting an investor for his business and assets.
…
US Interests
"When we have people like Stephen Payne, Mike Pompeo, Rick Perry and Congressman Wesley Hunt linked to oligarchs who are trying to steal control and assets by any means and to the extent they were willing to throw millions at Americans, you end up with individuals misusing their diplomatic powers for

<u>their own financial benefit,</u> even if that undermines United States interests with Uzbekistan as a whole."

6. The words in bold type were hyperlinked to an article on td-partner.com dated 28 December 2024, entitled *"Billions in Offshores: How Ovik Mkrtchyan Withdrew Uzbekistan's Wealth"*, which was accessible at <u>https://td-partner.com/novosti/item/106960-billions-in-offshores-how-ovik-mkrtchyan-withdrew-uzbekistan-s-wealth</u> ("**the Hyperlinked Article**").

7. On an unknown date, the Defendant amended Publication 1a. However, the amended version ("**Publication 1b**") contained the following underlined defamatory words of and concerning the Claimant:

   "<u>Aripov's key business partner is the head of GOR Investments</u> for which former US Energy Secretary, Rick Perry and Mike Pompeo are members of the advisory board **reportedly having transferred more than a billion dollars** <u>to offshore accounts</u>.

   …

   US Interests

   "When we have people like Stephen Payne, Mike Pompeo, Rick Perry and Congressman Wesley Hunt linked to <u>oligarchs who are trying to steal control and assets by any means and to the extent they were willing to throw millions at Americans, you end up with individuals misusing their diplomatic powers for their own financial benefit,</u> even if that undermines United States interests with Uzbekistan as a whole." ("**the Further Words Complained Of**")

8. The words in bold type were also hyperlinked to the Hyperlinked Article.

**<u>Defamatory meaning</u>**

9. The Words Complained Of, published in Publications 1a, 2, 3 and 4, in their natural and ordinary meaning and when read in the full context of the respective publications meant and were understood to mean that:

The Claimant is guilty of corruption in that he used his companies, Asia Alliance Bank (which he appropriated from Gulnara Karimova) and Gor Investment, to embezzle more than a billion dollars, which he transferred into dozens of offshore accounts he created for this purpose, and in that he bribed high-profile U.S. officials.

10. The Further Words Complained Of, published in Publication 1b, in their natural and ordinary meaning and when read in the full context of the amended article, meant and were understood to mean that:

The Claimant is guilty of corruption in that he embezzled more than a billion dollars by transferring it to dozens of offshore accounts, and in that he bribed high-profile U.S. officials.

11. Further or alternatively, by way of innuendo, ordinary and reasonable readers of Publication 1b in possession of knowledge of the fact that the Claimant is head of GIL, would understand the Further Words Complained Of to carry the meaning pleaded at paragraph 10 above.

## Serious harm under s.1(1) of the Defamation Act 2013

12. Publication of the Article (in its original form and as amended) has caused, or is likely to cause, serious harm to the Claimant's reputation.

---

**PARTICULARS OF SERIOUS HARM**

---

12.1.  The imputations pleaded at paragraphs 9 and 10 above are salacious, grave and inherently likely to cause harm to both the Claimant's personal and professional reputations. The Defendant accuses the Claimant of organised, serious and sustained criminality and corruption, involving the embezzlement of over one billion dollars and bribery of high-profile U.S. officials.

12.2.   The true extent of publication is not yet known. However, pending disclosure, the inference will be invited that Publications 1a, 1b, 2, 3 and 4 have each been published to a substantial but unquantifiable number of people in this jurisdiction and around the globe, as:

12.2.1.    The Defendant is a public figure with a large online following. She has 9,744 followers on Twitter (@RadhaStirling), 1,327 followers on Instagram (@radhastirling) and 374 subscribers on YouTube (@radhastirling2991). It is to be inferred that the Defendant's Websites attract a similarly high number of regular readers.

12.2.2.    The Article was published on several platforms operated by the Defendant.

12.2.3.    On 17 January 2025, the Defendant (via her Twitter/ X account @RadhaStirling) published the following tweet promoting Publication 3, which tagged prominent and influential news sites. It received three likes and has been viewed c.300 times:

"US Lobbyists used in plot to destabilise US relations with #Uzbekistan and steal Central Asia's largest cement holding @ICIJorg  @TheDiplomatMag  @CNNBusiness  @IBTimes @ReutersBiz [hyperlink to Publication 3]".

12.3.   The Claimant does not court media attention and, prior to the publication of the Article, there were very few articles about him published online, and no articles critical of the Claimant on any website or social media platform as prominent as those operated by the Defendant. As such, the Court will be asked to infer that readers would only learn of the imputations concerning the Claimant identified at paragraphs 9 and 10 above from the Defendant's numerous publications of the Article.

12.4.    On 21 January 2025, UK financial provider 'Emerald24' refused to open an account for GIL, without giving any reasons. This refusal was communicated to GIL's representatives within days of the publication of Publications 1a, 1b (if amended prior to this date), 2, 3 and 4. The Court will be asked to infer that, in the circumstances, GIL was refused banking services because of harm caused to the Claimant's reputation arising from the Article. The Claimant will rely on the following facts and matters in support of the inference:

    12.4.1.    the absence of significant prior media attention or interest in the Claimant, as to which paragraph 12.3 above is repeated;

    12.4.2.    the exacerbation of any pre-existing scrutiny of, or interest in, the Claimant by the publication of the Defendant's articles.

    12.4.3.    the Defendant's publication and republication of the Article on such a wide scale made it likely that it would have been available to businesses offering banking and financial services, where they conducted regulatory and compliance checks;

    12.4.4.    the Claimant's very close association with both GIL and the similarly named GLL, as sole shareholder of both companies, and the direct references in the Article to both GIL and the Claimant; and

    12.4.5.    the coincidence in time between the Defendant's publications and the refusal of banking services.

12.5.    On 31 December 2025, Revolut Bank ("**Revolut**") requested information about the Claimant's involvement with GLL within 21 days as part of a compliance investigation, which was required to maintain access to the account. GLL's bank account was suspended before the expiry of that period, on 6 January 2025. GLL's representative provided the requested information on 13 January 2025. Subsequently, after the Defendant's Publications were published:

12.5.1.    In the second half of February 2025, Revolut informed two companies which were affiliated with GLL, and which held accounts with it, that they would be subject to an account closing procedure.

12.5.2.    GLL's representative was notified on 14 March 2025 that Revolut would no longer offer its banking services and would be closing both GLL's account and the personal account of a family member.

12.5.3.    The Court will be asked to infer that, in the circumstances, these banking services were definitively withdrawn by Revolut because of harm caused to the Claimant's reputation arising from publication of the Article, and because of the association of the account holders with the Claimant and the allegations in the Article. The Claimant will rely on paragraphs 12.4.1– 12.4.5, which are repeated *mutatis mutandis,* in support of this inference.

12.6.    GIL was provided with banking services in this jurisdiction by UK Bank '3S Money'. On 27 March, 3S Money refused a request for GLL to open an account. GIL's own banking services were withdrawn by 3S Money on 7 April 2025, and its account closed, on the basis that the provision of such services no longer aligned with the bank's risk appetite, it having made express reference to publicly available sources raising compliance issues. The Court will be asked to infer that, in the circumstances, GIL's banking services were withdrawn and GLL was refused banking services because of harm caused to the Claimant's reputation arising from the Article. Paragraphs 12.4.1– 12.4.5 above are repeated *mutatis mutandis* in respect of the refusal and withdrawal of services from GLL and GIL.

12.7.    The Defendant holds herself out publicly as an expert in, *inter alia*, matters of extradition, corruption and human rights abuses, with a particular focus on matters concerning the Middle East. Further, her website dueprocess.international purports to hold criminals, corporations, law

enforcement organisations and governments accountable. It is to be inferred that readers of her websites would consider the Claimant to have been exposed as a wrongdoer by the Defendant, who was seeking to hold him to account for corruption and abuse of power.

12.8.  The allegations are presented as factual and truthful. The Defendant did not include any denials on the part of the Claimant or any other information which might cast doubt on the claims, including in respect of Publications 1b and 3 which remain live, despite being on notice of the Claimant's strong denials since receiving the letter of claim on 12 January 2025.

12.9.  The Claimant will rely on the grapevine effect.

**Relief**

**(a) Damages**

13. In support of the Claimant's claim for general and/or aggravated damages, he will rely upon the following facts and matters:

13.1.  Paragraphs 12.1 – 12.9 above are repeated.

13.2.  Publication of the words complained of at Publications 1a, 1b, 2, 3 and 4 has caused the Claimant to suffer very significant distress. The Claimant feels that his life and the lives of his family members have been endangered by the publication of the Article, which, given the extremely serious nature of the imputations it contains, is likely to prompt adverse responses to them from state and state security service actors.

13.3.  The Defendant published the Article as the most prominent part of a coordinated disinformation campaign carried out against the Claimant and his family members and business associates, escalating from August 2024 onwards ("**the Campaign**"). The Campaign has caused the Claimant very significant damage (including financial damage) and the fact that the Article

plays a part in it has greatly exacerbated his resulting distress. The Claimant will rely on the following facts and matters:

13.3.1.    The Campaign initially took place from around August 2024, in the form of publications on Russian language websites and social media platforms, before increasing in scale and intensity in late 2024.

13.3.2.    In December 2024 and January 2025, the Campaign was redirected, and its malign effects on the Claimant and his reputation were intensified by it being carried out via publications made in English. The Article was published and re-published between 16 – 18 January 2025.

13.3.3.    The Article is the most high-profile, and ostensibly credible, iteration of the Campaign.

13.3.4.    The Article includes allegations which are commonly, and exclusively, found in other articles published as part of the Campaign against the Claimant, such as falsely associating him with Gulnara Karimova.

13.3.5.    The Article is written in the style of a legitimate and objective news or current affairs story and refers throughout to the Defendant in the third person, in a manner which suggests she is an independent expert in its subject matter being quoted by its journalist author. However, the impression of legitimacy and credibility which this gives the reader is false:

(a) the Article appears on the Defendant's Websites, on which all of the content appears to have been written or caused to be written by the Defendant personally, and therefore the references to her within it in the third person and as an independent expert are deliberately misleading;

10

(b) the Article is gratuitously sensationalist, referring in urgent terms to high-profile U.S. officials, despite the lack of any proper connection between those individuals and its ostensible subject matter;

(c) the Hyperlinked Article, cited as a source within the Article, was published on a now disabled website which was not on any view a reputable source of information or news, and amounted to a flagrant character assassination of the Claimant, and not, as it is repeatedly presented by the Defendant, a trustworthy source of news or information;

(d) paragraph 2.3 above is repeated. Although the exact nature of the services offered by the Defendant is unclear, her activities appear to take the form of paid advocacy and public relations work on behalf of clients, which includes publishing and promoting content on the Defendant's Websites and elsewhere;

(e) the content of the Article indicates that it has been written on behalf of and/or to advance the interests of Ulugbek Shadmanov, an adversary of the Claimant in respect of his business interests in Uzbekistan, who is referred to repeatedly within it. The Defendant is accordingly likely to have written and published it on behalf of Mr Shadmanov, or a person acting on his behalf, as her client; and

(f) the manner of the publication and republication of the Article on a series of different websites operated by the Defendant is inconsistent with the journalistic practice of only publishing a single, definitive, article in respect of a given story, and is more consistent with a paid public relations and/or disinformation campaign.

13.3.6.    In the circumstances, the Article was published as part of the Campaign, and not as an exercise in legitimate and responsible journalism or disinterested policy activism.

13.4.   The Defendant failed to comply with the Pre-Action Protocol for Media and Communications Claims ("**the Protocol**"). Instead, she adopted an inquisitorial and combative approach towards the Claimant and his complaint by:

    13.4.1.   Failing to provide a Protocol-compliant response to the Letter of Claim, setting out the nature of any defences relied upon, or exchanging other relevant information. The Defendant has never suggested that she has any, or any proper, basis for the allegations in the Article.

    13.4.2.   Instead, in a letter sent by her purported legal representative, Aleksejs Jelisejevs, dated 19 February 2025, asking a number of irrelevant, hostile, and self-serving questions of the Claimant. The questions clearly implied the truth of the imputations in the Article, while failing positively to assert that they are true, or to provide any other information about the circumstances of its publication.

    13.4.3.   Initially removing Publication 4 on a temporary basis, then reuploading it without good reason, before again removing it but keeping a draft of the published version. There is no good reason for the Defendant to keep a draft version (and alert the Claimant to that fact, which she did on 7 May 2025) if she had no intention to republish it at a future date, and if she was not in fact seeking - by referring to its draft status - to pressurise and threaten the Claimant in respect of his complaint.

13.5.   The Defendant did not approach the Claimant for comment prior to publication of the Publications, nor did she amend those Publications which remain live upon receiving the denials in the letter of claim.

13.6.   The Defendant has failed to apologise or correct the Article.

13.7.  Publications 2 and 4 were taken down on a date unknown to the Claimant. However, at no point in pre-action correspondence did the Defendant disclose that the Article was also published on her other platforms, which have since been discovered by the Claimant.

**(b) Injunction**

14. In support of the Claimant's claim for an injunction, he relies upon the facts and matters pleaded at paragraphs 13.4.3, 13.5, 13.6, and 13.7 above.

**(c) Order under s.12 Defamation Act 2013**

15. The Claimant seeks an order under s.12 of the Defamation Act 2013 for the Defendant to prominently publish a summary of the judgment on each of her Websites and her Twitter/X page.

**AND the Claimant claims**

(1) Damages, including aggravated damages;

(2) An injunction to restrain the Defendant, whether by herself, her servants, agents, or otherwise howsoever from publishing and/or causing to be published the same or similar words defamatory of the Claimant;

(3) An Order that the Defendant publish a summary of the court's judgment under s.12 Defamation Act 2013;

(4) Costs; and

(5) Such further or other relief as the Court deems appropriate.

**GERVASE DE WILDE**

**LILY WALKER-PARR**

**5RB**

**6 June 2025**

13

**STATEMENT OF TRUTH**

I believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name

Ovik Mkrtchyan

Date

06/06/2025

Signature

# Exhibit 4

**IN THE HIGH COURT OF JUSTICE**                     <u>**Claim no. KB-2025-001365**</u>
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

**B E T W E E N :**

**OVIK MKRTCHYAN**

<u>**Claimant**</u>

**- and -**

**(1) 2TROM MEDIA GROUP LTD**
**(2) VICTOR TOKAREV**

<u>**Defendants**</u>

**PARTICULARS OF CLAIM**

<u>**Parties**</u>

1.  The Claimant is a businessman and entrepreneur. He is the sole shareholder of Gor Investment Ltd (Company number 03820831) ("**GIL**"), the parent company of a diverse portfolio of companies based in the UK, Uzbekistan and Canada. He is also a shareholder of five other UK-based companies, including the UK-registered company Gor Logistic Limited (Company number 04547356) ("**GLL**"), of which the Claimant is the sole shareholder. He founded the Asia Alliance Bank.

2.  The First Defendant is a UK-registered company (Company number 11673306) and the owner and operator of the London Post website (london-post.co.uk) ("the Website"), the Twitter/X account @LondonPostUK and the Facebook page https://www.facebook.com/LondonPostUK.

3.  The Second Defendant is the sole director of the First Defendant.

1

**The words complained of**

4. On or about 19 October 2024, the Defendants and each of them published an article on the Website, entitled "*Corruption Networks of Uzbekistan: From Washington to Tashkent*". It remains accessible at the following URL: https://london-post.co.uk/corruption-networks-of-uzbekistan-from-washington-to-tashkent/ ("**the Article**").

5. The Article contained the following underlined words defamatory of the Claimant ("**the Words Complained Of**"):

"[Headline] <u>***Corruption Networks of Uzbekistan: From Washington to Tashkent***</u>

[1] *When you think about U.S. influence in Central Asia, especially in places like Uzbekistan, the image often conjured up is one of aid, partnership, and "democratic reforms." But behind the polished handshakes, diplomatic meetings, and promises of economic support, there's a darker reality at play. This reality is that American elites—<u>and their counterparts in former Soviet republics—are manipulating every tool at their disposal to control, exploit, and profit from a region they treat like a global chessboard</u>.*

[2] *At the centre of this intrigue is a <u>cast of shady characters, including Ovik Mkrtchyan</u>, a businessman with deep ties to Uzbekistan's former dictator, Islam Karimov. <u>Mkrtchyan</u>, alongside key player like Uktam Aripov, <u>has created a network of financial and political schemes that not only undermines Uzbekistan's sovereignty but keeps the country firmly within the grip of foreign manipulation</u>.*

[Subtitle] *Lobbyists, Politicians, and the Dark Side of U.S. Diplomacy*

[3] *What makes this even more shocking is the involvement of American lobbyists and politicians. <u>Mkrtchyan and his partners have built connections with the U.S. political elite through firms like "Linden Strategies," managed by</u>*

2

*former White House insiders like Steve Payne. These aren't just casual meetings; this is a calculated web of influence designed to siphon money out of Uzbekistan while simultaneously propping up Western politicians.*

[4] *Even more troubling, figures like former U.S. Secretary of State Michael Pompeo are said to be tied to this scheme through Gorinvestment* [sic]. *The partnership between Uzbek and American elites raises serious questions about who really benefits from these so-called "development deals." Is it the Uzbek people, who still struggle with poverty and lack of basic freedoms, or the small group of elites with offshore accounts?*

[Subtitle] *Uzbekistan's New Reality: The Illusion of Progress*

[5] *While President Shavkat Mirziyoyev speaks of modernization and reform, the reality is that* <u>corruption remains deeply embedded in the system</u>.

[6] <u>*Asia Alliance Bank in Uzbekistan, despite its outwardly clean reputation, has found itself at the center of dubious events in recent years, particularly related to its privatization and suspicious internal reshuffling. In 2022, the government sold a controlling stake in the bank to British company Gor Investment Limited — a firm linked to Ovik Mkrtchyan, notorious for his involvement in international corruption schemes. This move, portrayed as part of a broader privatization program for state assets, has sparked serious concerns over the transparency of the deal. Many suspect that key assets and control were transferred to affiliated individuals before the sale, further entrenching Mkrtchyan's influence within Uzbekistan's financial sector*</u>.

[7] *While Asia Alliance Bank hasn't been directly implicated in major corruption scandals,* <u>*Mkrtchyan's connection through Gor Investment raises undeniable questions. As Uzbekistan's banking sector remains mired in corruption, this bank has become part of broader schemes to siphon off capital. Embezzlement and fraud in state banks have become routine, with significant funds intended for social programs disappearing into shadowy networks, leaving little trace.*</u>

[8] *All of this only deepens the public's distrust in Uzbekistan's banking system.* <u>*Government-led reforms, touted as efforts to combat corruption, serve more as*</u> <u>*a cover for those leveraging the bank to launder questionable funds and solidify*</u> <u>*their positions within the country's elite — figures like Mkrtchyan among them.*</u>

[9] *While the rhetoric from Tashkent and Washington is all about progress, democracy, and development, the reality is far more cynical. The same dirty money, the same shadowy political deals, and the same players remain firmly in control.*

[Subtitle] *What Does the Future Hold?*

[10] *This isn't just a story about Uzbekistan. It's a tale of how Western elites continue to exploit developing countries for their own gain. Corruption has become a tool of influence, used to manipulate governments and line the pockets of a few.* <u>*Until figures like Ovik Mkrtchyan and Uktam Aripov are held accountable—and until their Western backers face the same scrutiny— countries like Uzbekistan will remain pawns in a much larger game*</u>.

[11] <u>*As the West continues to preach democracy and development, its actions behind closed doors tell a different story: one of corruption, exploitation, and a new form of colonialism dressed up as economic aid. The question is, how long will this charade continue before the full extent of this corruption is exposed? And when will both local elites and their Western enablers finally be brought to justice?*</u>"

## Defamatory meaning

6. The Words Complained Of, in their natural and ordinary meaning and when read in the full context of the Article meant and were understood to mean that:

> (1) The Claimant is the key player in an Uzbekistan corruption network, which embezzles state funds using offshore accounts and launders money to gain political favours; and

(2) The Claimant used the purchase of a controlling stake in Asia Alliance Bank in 2022 by his company, Gor Investment Ltd, as a front for him to embezzle state funds and corruptly seize control of state assets in Uzbekistan.

## Serious harm under s.1(1) of the Defamation Act 2013

7. Publication of the Article has caused, or is likely to cause, serious harm to the Claimant's reputation.

————————————————————

### PARTICULARS OF SERIOUS HARM

————————————————————

7.1.    The imputations pleaded at paragraph 6 above are salacious, grave and inherently likely to cause harm to both the Claimant's personal and professional reputations. The Defendants accuse the Claimant of organised, serious and sustained criminality and corruption, involving the embezzlement of state funds and corrupt seizure of control of assets for his own financial gain.

7.2.    The true extent of publication is not yet known. However, pending disclosure, the inference will be invited that the Article has been published to a substantial but unquantifiable number of people in this jurisdiction and around the globe, as:

7.2.1.    The London Post has a substantial online following. Its Twitter/X account (@LondonPostUK) has 3,071 followers and its Facebook page (www.facebook.com/LondonPostUK) has 18,000 followers.

7.2.2.    In the premises, it is to be inferred that the Defendants' Website attracts a similarly high number of regular readers.

7.3.    The Claimant does not court media attention and, prior to the Defendants' publication of the Article, there were: very few articles about him published

in England and Wales, or in English online; and no articles critical of the Claimant on any website or social media platform as prominent as those operated by the Defendant. As such, the Court will be asked to infer that readers in this jurisdiction would only learn of the imputations concerning the Claimant identified at paragraph 6 above from the Defendants' defamatory Article.

7.4.    Following publication of the Article, GLL and GIL have been refused services from UK financial institutions in the following circumstances:

7.4.1.    On 27 November 2024, Revolut Bank ("**Revolut**") began a compliance process in respect of GLL. The Claimant's representative responded on 6 December 2024. On 31 December 2024, Revolut requested information about the Claimant's involvement with GLL within 21 days as part of a compliance investigation, which was required to maintain access to the account. Thereafter:

(a) GLL's bank account was suspended before the expiry of that period, on 6 January 2025;

(b) GLL's representative provided a comprehensive account of the requested information on 13 January 2025;

(c) In the second half of February 2025, Revolut informed two companies which were affiliated with GLL, and which held accounts with it, that they would be subject to an account closing procedure; and

(d) GLL's representative was notified on 14 March 2025 that Revolut would no longer be offering it banking services and would be closing both GLL's account, and the personal account of a family member.

7.4.2.    On 21 January 2025, UK financial provider Emerald24 refused to open an account for GIL, without giving any reasons.

7.5. The Court will be asked to infer that, in the circumstances, GLL, GIL and the Claimant's family member were refused banking services because of harm caused to the Claimant's reputation arising from the Article. The Claimant will rely on the following facts and matters in support of the inference:

    7.5.1.    the absence of prior media attention or interest in him, as to which paragraph 7.3 above is repeated;

    7.5.2.    the exacerbation of any pre-existing scrutiny of, or interest in, the Claimant by the publication of the Article;

    7.5.3.    the Defendants' publication of the Article on such a wide scale made it likely that it would have been available to businesses offering banking and financial services, where they conducted regulatory and compliance checks;

    7.5.4.    the Claimant's very close association with both GIL and the similarly named GLL, as sole shareholder of both companies, and the direct references in the Article to both GIL and the Claimant; and

    7.5.5.    the coincidence in time between the Defendants' publications of the Article and the refusal of banking services.

7.6. The allegations are presented as factual and truthful. The Defendants did not request or include any comment on the part of the Claimant or any other information which might cast doubt on the claims.

7.7. The Claimant will also rely on the grapevine effect.

## <u>Relief</u>

**(a) Damages**

7

8. In support of the Claimant's claim for general and/or aggravated damages, he will rely upon the following facts and matters:

8.1.    Paragraphs 7.1 - 7.7 above are repeated.

8.2.    The Defendants' publication of the Article has caused the Claimant very significant distress. The Claimant feels that his life and the lives of his family members have been endangered by the publication of the Article, which, given the extremely serious nature of the imputations it contains, is likely to prompt adverse responses to them from state and state security service actors.

8.3.    The Defendants published the Article as part of an apparently coordinated disinformation campaign carried out against the Claimant and his family members and business associates, escalating from August 2024 onwards ("**the Campaign**"). The Campaign has caused the Claimant very significant damage (including financial damage) and the fact that the Article plays a part in it has greatly exacerbated his resulting distress. The Claimant will rely on the following facts and matters:

8.3.1.    The Campaign initially took place from around August 2024, in the form of anonymously authored publications on Russian language websites and social media platforms, before increasing in scale and intensity during the second half of 2024.

8.3.2.    The Article was the first iteration of the Campaign to be prominently published in English.

8.3.3.    When first published, the Article was the most high-profile, and ostensibly credible, iteration of the Campaign, and includes allegations against the Claimant which have consistently been made as part of the Campaign, such as falsely associating him with Islam Karimov and/or the Karimov family.

8.3.4.    The Website predominantly carries local news articles about events in London, the majority of which appear to be republications of council, local government, and corporate press releases. It does not appear to publish foreign news, or investigations in relation to topics similar to those purportedly addressed by the Article.

8.3.5.    The Article:

(a) is distinct from the typical content of the Website, as described at paragraph 8.3.4 immediately above, indicating that it was written and published on a different basis from the majority of the other content of the Website;

(b) does not carry the byline of an identified journalist, instead being attributed only to *"Ldn-Post"*, indicating that no individual writer or editor wished to be understood to be responsible for or associated with its content;

(c) is written in a hyperbolic, gratuitously sensationalist, and grandiose style, inappropriate to the nature of the allegations it contains;

(d) makes vague but extremely serious allegations of wrongdoing against the Claimant and his businesses, with a lack of precision or detail, which suggests it was written and published with no concern for the veracity of its content, or any associated legal risk; and

(e) is incoherent, and gratuitously refers to Asia Alliance Bank, a private bank in the highly-regulated Uzbek banking sector, in which the Claimant was, as at the date of publication of the Article, only a shareholder, as to which the Article contains self-contradictory statements to the effect that the bank is somehow not only *"[6] … at the center of dubious events in recent years"*, but also that it *"[7] … hasn't been directly implicated in major corruption scandals"*. This indicates a

lack of editorial oversight or proper consideration of the allegations being advanced as part of the Article.

8.3.6.    In the circumstances, the Article was published as part of the Campaign, and not as an exercise in legitimate and responsible journalism.

8.4.    The Defendants did not approach the Claimant for comment prior to the Article's publication. Had they done so, the Claimant could have corrected the position.

8.5.    The Claimant sent emails to several of the Defendants' employees on 4 December 2024, but these were all returned as the email addresses could not be found and appear to be fictitious. The Claimant has therefore been left with no option but to issue a claim without engaging in any Pre-Action Protocol correspondence.

9.    In support of the Claimant's claim for exemplary damages under section 34 of the Crime and Courts Act 2013 ("**the CCA 2013**"), he will rely upon the following facts and matters:

9.1. Paragraphs 7 and 8 above are repeated.

9.2. The First Defendant is and was at all material times a "relevant publisher" within the meaning of section 41(1) of the CCA 2013.

9.3. The present claim is a claim for libel and is therefore a "relevant claim" as defined by section 42(4)(a) of the CCA 2013.

9.4. The claim is related to the publication of news-related material within the meaning of section 41(2) of the CCA 2013.

9.5. The First Defendant, by the 'Contact Us' page on its Website (https://london-post.co.uk/contact/), purports to be regulated by the Independent Press

Standards Organisation ("**IPSO**") and to abide by IPSO's Editors' Code of Practice. However, this is a sham: it does not appear in the approved list of IPSO members as set out at https://www.ipso.co.uk/making-a-complaint/who-ipso-regulates/. In any event, IPSO is not an " approved regulator" as defined by section 42(2) of CCA 2013.

9.6. The First Defendant is not a member of IMPRESS, the relevant "approved regulator".

9.7. In the circumstances set out above, the First Defendant has demonstrated a deliberate or reckless disregard of an outrageous nature for the Claimant's rights, and it is appropriate to punish it by awarding exemplary damages. Other remedies would not be adequate.

**(b) Injunction**

10. In support of the Claimant's claim for an injunction, he relies upon the facts and matters pleaded above at paragraphs 8.3 to 8.5 above. The Claimant has been left with no alternative but to issue proceedings to secure the Article's removal.

**(c) Order under s.12 Defamation Act 2013**

11. The Claimant seeks an order under s.12 of the Defamation Act 2013 for the Defendants to prominently publish a summary of the judgment on its website and social media pages.

**AND the Claimant claims**

(1) Damages, including aggravated damages and exemplary damages under section 34 of the Crime and Courts Act 2013;

(2) An injunction to restrain the Defendants, whether by themselves, their servants, agents, or otherwise howsoever from publishing and/or causing to be published the same or similar words defamatory of the Claimant;

(3) An Order that the Defendants publish a summary of the court's judgment under s.12 Defamation Act 2013;

(4) Costs; and

(5) Such further or other relief as the Court deems appropriate.

**GERVASE DE WILDE**

**LILY WALKER-PARR**

**5RB**

**12 June 2025**

**STATEMENT OF TRUTH**

I believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name: Ovik Mkrtchyan

Date: 12 June 2025

Signature: